## FEDERAL CEMENT TILE CO. v. HENNING.

Circuit Court of Appeals, Eighth Circuit. April 10, 1929.

No. 8366.

C. E. Warner, of Minneapolis, Minn., for appellant.

Paul J. Thompson, of Minneapolis, Minn. (Carleton F. Boeke and Thompson, Hessian & Fletcher, all of Minneapolis, Minn., on the brief), for appellee.

Before LEWIS, Circuit Judge, and WOODROUGH and McDERMOTT, District Judges.

WOODROUGH, District Judge. This appeal is taken to reverse a judgment for damages for a personal injury found to have resulted from a defective scaffold erected and in use by the Federal Cement Tile Company in tiling the roof of the Minneapolis Auditorium building. The trial court formulated and submitted the issues to the jury with

such careful accuracy that no exceptions were taken to particulars of the charge. Through appropriate assignments of error the appellant contends for reversal;

(1) That the plaintiff's alleged cause of action against defendant had been relinquished by contract and so he had no right to maintain suit upon it. (2) That the plaintiff was, as a matter of law, a mere licensee and not an invitee of defendant upon the scaffold. (3) That there was not sufficient proof of the alleged defect in the scaffold. (4) That the plaintiff was guilty of contributory negligence, as matter of law.

█ The contracts relied upon by appellant to defeat the action are before the court and include the general contract between the city of Minneapolis and the general contractor for the labor and materials for the whole building; the subcontract between the general contractor and the defendant, Federal Cement Tile Company, for labor and material for the roof; and the subcontract between the tile company and J. H. Henning & Son, letting all of the roof work except the furnishing and laying of the cement tile to J. H. Henning & Son. On inspection these contracts disclose the ordinary builders contract provisions concerning personal injuries and claims therefor. The general contractor is to save the owner harmless from any such claims arising from the work, and to provide itself with insurance to that end, and each of the subcontractors obligates itself similarly. But no provision is found which directly or impliedly obligates either the plaintiff or the firm of J. H. Henning & Son, to which he belongs, to refrain from suit against the tile company for torts which the tile company may commit to the injury of J. H. Henning & Son, to members of that firm like the plaintiff, or to any of that subcontractor's employees. Appellant's contention that plaintiff's right to sue had been contracted away from him is without merit.

█ On the point of whether the plaintiff was on the scaffold as a mere licensee or invitee of defendant, the court instructed the jury: "The first question for you to determine in the case is whether Charles Henning was upon that scaffolding in connection with his own business, or whether he was there in connection with the business of the defendant as well. His claim is that the Federal Cement Tile Company had a contract for putting the roof on the auditorium; that they were to do not only the cement tile work, but also the sheet metal work and the asphalt work; that they had sublet to himself and his father, the partnership of J. H.

Henning & Son, the putting on of the asphalt and the sheet metal work, and that he went up there that day for the purpose of seeing Mr. Evenson (the superintendent of defendant) with respect to the putting on of the sheet metal work, and that he was not only interested in that, but that the Federal Cement Tile Company was interested in that, and that he was there in connection with this subcontract.

"The claim of the Federal Cement Tile Company in that regard, as I understand it, is that the plans and specifications were complete, and that there was no necessity for Mr. Henning being there at all, and that he came up there solely on his own account, and that they owed him no duty, that is, that they had built the scaffolding for their own purposes; that they had built it for the purpose of their men moving the cement tiles along on these trucks and for the purpose of having the tiles placed upon the roof, and they had built it for their own use and for the use of those who properly had business with them, that is, their employees, and any others who might be engaged in the construction of that roof.

"Now, of course, it is obvious that if a stranger should come there for the purpose of looking at the scenery or for the purpose of passing the time of day with Mr. Evenson, or something of that kind, and not on any business with the Federal Cement Tile Company, he would have to take that scaffolding exactly as he found it, that is to say; there would be no liability on the part of the Federal Cement Tile Company if he fell off the scaffolding or if the supports gave way, because he was there or would be there in the capacity of a stranger to them, and they would owe him no duty. So that if Mr. Henning was there solely on his own business and not in connection with any business of the Federal Cement Tile Company they would only be liable to him in case they willfully or intentionally injured him, or in case they failed to disclose some hidden condition which they knew about and he did not know about.

"So that in this case, if you find that Charles Henning was not there in connection with the business of the Federal Cement Tile Company, then your verdict will be for the defendant tile company, because there is no claim here that there was any intentional injury occasioned to Mr. Henning by the tile company and there was no willful or wanton injury, and no failure on the part of the tile company to disclose some hidden condition which they knew about and which he

did not know about, and the burden in that connection is upon Mr. Henning. He must show by a fair preponderance of the evidence, or the over weight of the testimony, that he was there in connection with the business of the Federal Cement Tile Company, which means that the evidence in that regard must be to some extent more convincing than the evidence which tends to prove the contrary, before you would be justified in finding that Mr. Henning was there upon the business of the tile company."

There is evidence that at the time of the accident the plaintiff was upon an errand of particular concern to the defendant. The defendant had to guarantee the roof against leaking, and its superintendent was very particular about the sheet metal work referred to as "flashing" and the application thereof upon the roof by its subcontractor. The record does not disclose how minutely the specifications may have gone into the matter of the flashings as the specifications were not introduced, but plaintiff swears that it was necessary for him and defendant's superintendent and the architect's representative to get together right on the work, and by test and demonstration to settle upon the flashing and the manner of application. Plaintiff was proceeding at the time of the accident in company with the architect's assistant to the point on the work where the defendant's superintendent was. They went pursuant to appointment made in advance and for this mutual and common purpose incident to the work. Plaintiff had samples of flashing under his arm at the time. There was no lack of evidence to justify the court's instruction.

As to the defect in the scaffolding, it was alleged against defendant in plaintiff's petition as negligence that certain members of the scaffold were not nailed together. The proof is clear that the plan of the scaffold and the purpose for which it was designed and used contemplated that these members should be firmly nailed together, and defendant's witnesses said that they were so nailed. Neither the plaintiff nor any of his witnesses swore positively that the members were not nailed. On the other hand, the circumstances of the accident, as developed by plaintiff and his witnesses, are hardly reconcilable with the hypothesis that they were nailed. The scaffold was for the use of the tile company's laborers to convey the cement tile for the roof on two-wheeled trucks such as are used in freight houses. The tile were about 4 feet long and 2 feet wide, weighing over a hundred pounds apiece, and a trucker would push two of them at a load on the running boards of the scaffold. The support of the scaffold at the point of the accident consisted of two upright pieces of 2x6 scantlings about 6 feet long standing upon the asphalt floor of the gutter. The gutter was about 8 feet wide and 6 feet deep at the point in question. Across the top of these upright pieces was nailed a 2x8 plank of which one end rested on the top of a solid inner wall where it could not be nailed and the other end reached to the face of another outside wall which extended some 2 feet higher than the scaffold. At the end of the plank which rested on the wall a cleat was nailed to the plank down along the face of the wall. The two running boards of the scaffold, which were 2x10 planks 20 feet long, were laid at right angles to the crosspiece and should have been nailed securely thereto.

The plaintiff was walking on the running boards of the scaffold when he saw one of defendant's laborers coming towards him on the running boards pushing a truck loaded with one or two tiles for the roof. There was not room to pass on the running boards, so the plaintiff stepped off onto the crosspiece to allow the truck to pass. The plaintiff says that he did not jump or step hurriedly. "I stepped onto it sideways, stepping from the running plank diagonally onto the crosspiece." The crosspiece and the upright to which it was nailed moved out of place as plaintiff stepped on the crosspiece causing his fall and injury. Plaintiff says the movement of these members of the scaffolding was in the direction towards which he had been walking before he stepped aside to let the truck pass, and that the crosspiece moved probably 3 or 4 feet, and he remembers seeing a man push it back and straighten it up. If it was true that the plaintiff stepped as he says he did and the scaffold members fell as far out of position as he claims, and that they were so pushed back into position by hand, there could be no doubt of the correctness of the statement made by the trial court in ruling against the motion for a new trial. He said, "The cross member, the shifting of which under the weight of the plaintiff caused the accident, was not properly fastened to the planks running lengthwise or it could not possibly have moved, and its movement necessarily tends to disprove the claims of the defendant that it was fastened (nailed)." There was some corroboration of this in the testimony of a witness for plaintiff who inspected the scaffold at the point in question shortly after the accident, and swore that he did not notice any nails fastening the

running planks to the crosspiece. He would not swear there were none, but reiterated that he did not see any.

There is testimony that the plaintiff jumped against the crosspiece and so forced it out of position; that he stepped so far out towards the end of it beyond the point where it rested upon the upright that it tipped up with him; that the crosspiece shifted only slightly to an extent that might have been permitted by a bending of nails driven through the running board; that in fact the members were securely nailed, and other conflicting and confusing testimony on the question of the fall. Furthermore, some of the questions and answers in the record refer to a model held by counsel or the witness and tilted into different positions by them as the questions were asked and answered, so that the exact purport of that part of the evidence cannot be discerned from study of the printed record. For instance we have the question put to plaintiff by his counsel:

Q. "I wonder if you would bring this exhibit 'A' (a model of some scaffold members) around in front of the jury so they can see that part, and show them just how it turned while you stepped on it."

A. "This piece, the upright piece, or the piece attached to the upright on which I fell, was lying in this manner over here. There was a small crosspiece on here that was supposed to hold it. It had not fallen all the way over, but it was lying in that manner, somewhat like that partially tipped. I remember seeing a man push it back up this way."

Also the question to the witness Duval:

Q. "Now after you saw Henning in the condition you have described (after his fall) will you show where the crosspiece and the upright—just how they stood?"

A. "Well, I would say that it was standing in a position something like that (indicating by pushing small model over to the side slightly). It was not leaning clear over. It was just leaning, I would say, about 6 inches or 7 inches from where it would rest."

Such ocular demonstrations might outweigh positive assertions which are not so illustrated. The judge and jury saw the witnesses make the demonstrations before them and heard their testimony as well.

On the whole record, therefore, it cannot be said by this court that there was no sufficient evidence to justify the submission of the issue whether the plaintiff's fall was caused directly by the defect in the scaffold complained of in the petition. The issue was submitted by the trial court, no exceptions were taken to the form in which he did it, and we find no error.

Upon the claim of contributory negligence by the plaintiff it is contended that plaintiff need not have used the scaffold at all; that he need not have stepped onto the crosspiece and that other and safe ways were open to him to do what he went to do. But there is evidence that the running boards of the scaffold came right up to the scuttle hole from which he emerged onto the top of the building and led directly to the point on the work where defendant's superintendent was; that the runway of the scaffold, if it had been nailed as designed, presented the most natural and safe way for plaintiff to go; that he followed naturally after the architect's man along the runway; that at the particular point where he had to let the truck pass there was no other place to step offering such apparent security as the crosspiece on which he stepped, especially because the wall of the building at that point towards which he stepped was higher than the scaffold and offered him support and protection, while the top of the inner wall on the other side where the crosspiece rested was sloping conformably to the slant of the roof and unsafe to stand on. Upon this matter also the evidence was such that it was the duty of the trial court to submit the issue to the jury. He did so and no exception was taken to the trial court's declaration of the law applicable.

As we find none of the assignments of error to be well taken, the judgment is affirmed with costs.